UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSEPH FURANDO, | ) | 1:13-CR-189-SEB-TAB-04 |
| CARAVAN TRADING COMPANY, | ) | 1:13-cr-189-SEB-TAB-07 |
| LLC, | ) | |
| CIMA GREEN, LLC, | ) | 1:13-cr-189-SEB-TAB-08 |
| | ) | |
| Defendant. | ) | |

**FILED**
APR 15 2015
U.S. DISTRICT COURT
INDIANAPOLIS, INDIANA

**FACTUAL BASIS FOR GUILTY PLEA**

The United States of America, by counsel, Josh J. Minkler, United States Attorney for the Southern District of Indiana; Steven D. DeBrota, Senior Litigation Counsel; Jake Schmidt, Special Assistant United States Attorney; John C. Cruden, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice; and Thomas T. Ballantine, Assistant Section Chief, Environmental Crimes Section, Environment and Natural Resources Division; and the Defendants, JOSEPH FURANDO, CARAVAN TRADING COMPANY, LLC and CIMA GREEN, LLC ("Defendants"), in person and by their undersigned counsel, hereby present an agreed and joint factual basis for their pleas of guilty in the above-captioned case.

1

The parties stipulate and agree that the United States could prove the facts set out below to a jury beyond a reasonable doubt if the case went to trial. Because this joint factual statement is presented for the change of plea phase of these cases only, the parties reserve the right to present additional evidence at the time of sentencing. This pleading is not intended to foreclose the presentation of such evidence. Also, this pleading is not intended to include all facts known by the parties, only those necessary to support the guilty plea in this matter.

Defendant JOSEPH FURANDO is charged with conspiring to violate federal law and to defraud the United States, in violation of 18 U.S.C. § 371. The conspiracy he willfully joined had the following objects: Wire Fraud, False Claims, Clean Air Act False Statements, frustrating the lawful function of the Internal Revenue Service as it determined tax credit eligibility, and frustrating the lawful function of the Environmental Protection Agency as it administered its Renewable Fuels Standard. He is also charged with Wire Fraud (18 U.S.C. § 1343), False Statements to federal investigators (18 U.S.C. § 1001), and Engaging in Prohibited Transactions (18 U.S.C. § 1957).

Defendants CARAVAN TRADING COMPANY, LLC and CIMA GREEN, LLC are charged with conspiring to violate federal law and to defraud the United States, in violation of 18 U.S.C. § 371. The conspiracy they willfully joined had the following objects: Wire Fraud, False Claims, Clean Air Act False Statements, frustrating the lawful function of the Internal Revenue Service as it determined tax credit eligibility, and frustrating the lawful function of the

Environmental Protection Agency as it administered its Renewable Fuels Standard. They are also charged with Wire Fraud (18 U.S.C. § 1343).

## BACKGROUND

1.  The Energy Independence and Security Act of 2007 requires the U.S. Environmental Protection Agency (EPA) and the U.S. Internal Revenue Service (IRS) to encourage the production and use of renewable fuel in the United States. Specifically, this Act directs these agencies to write regulations and administer tax credits to ensure an increase in the amount of such fuel through a taxpayer-funded incentive program and a mandate that is applied to petroleum refiners and importers.

2.  Since May 2007, petroleum refiners and importers, known as "obligated parties," have been required by federal law to have renewable fuel in their product mixes. Obligated parties can meet this requirement by purchasing credits from renewable fuel producers. These credits are called "renewable identification numbers" or "RINs."

3.  Biodiesel is one type of renewable fuel. It is a fuel made from vegetable oils and/or animal fats that can be used to run diesel engines, usually after blending it with significant amounts of petroleum-based diesel. Pure biodiesel is known as B100 in the fuels industry and it is subject to particular industry standards. Once B100 is blended with petroleum diesel, it is no longer B100. Instead, it is known as BXX, where "XX" is the biodiesel percentage of the blend, by volume.

4.      Renewable fuel producers can generate RINs by producing qualifying renewable fuels, including biodiesel, in compliance with EPA regulations. Then, the producers can sell the RINs to obligated parties or middlemen, usually by selling a volume of biodiesel with a number of RINs "assigned" to that volume. It is illegal to generate RINs for a volume of biodiesel that is not actually produced in compliance with EPA regulations, and it is illegal to generate RINs more than once for any given volume of biodiesel.

5.      Under EPA's regulations, there are circumstances that allow a RIN owner to separate RINs from the volume of biodiesel to which they had been assigned. After separation, RINs could be bought and sold without buying and selling the associated fuel. From then on, this RIN-stripped biodiesel could never be used to generate more RINs.

6.      In 2009, retroactively in 2010, and in 2011, blenders could apply for fully refundable biodiesel mixture tax credits if they blended B100 with petroleum-based diesel, and then sold the resulting mixture for use as a fuel. If blenders complied with IRS rules and submitted appropriate documents and "Certificates for Biodiesel," they would receive one dollar per gallon in cash or credited against other taxes they owed. Thus, some biodiesel buyers were willing to pay a premium for B100, because they could earn the one dollar per gallon credit by blending it with petroleum diesel.

7.      Under IRS rules, blenders could qualify for the blender's tax credit by mixing a very small amount of petroleum diesel with B100. The product of this minimal blending is known as "B99.9" or "B99," which means that it is

99.9% biodiesel and 0.1 % petroleum diesel. It is illegal to claim a blender's tax credit for biodiesel unless the fuel is actually produced, blended, and sold in compliance with IRS rules. In particular, it is illegal to claim the credit without a true and accurate Certificate for Biodiesel, and it is illegal to claim the credit more than once for any given volume of biodiesel. A true and accurate Certificate for Biodiesel includes a portion of the form requiring the certifying company to state where the fuel was produced.

8. Because of the value of RINs and the blender's tax credit, one gallon of B100 with assigned RINs and an available tax credit is worth much more than one gallon of RIN-stripped B99.

## THE CONSPIRACY

9. Defendant Caravan Trading Company LLC and Defendant CIMA Green LLC were companies that Defendant JOSEPH FURANDO ("FURANDO") owned and essentially operated. Although FURANDO's wife owned fifty-one percent of both companies, FURANDO controlled them. FURANDO held the title of Vice President of Sales and Marketing at Caravan and CIMA. This title did not reflect his authority at the companies, which was essentially absolute. His co-conspirator, Katirina Tracy, worked for FURANDO and was a corporate officer for both companies. FURANDO carried out many of the actions set forth in this Statement of Facts in concert with Tracy. The companies, which were located in New Jersey, traded fuel and other products, particularly biodiesel. Between November of 2009 and January of 2012, the companies bought and sold more than 35,000,000 million gallons of biodiesel. The FURANDO

5

companies had no production capacity and the biodiesel they bought and sold was manufactured by others.

10. FURANDO's biggest customer was defendant e-biofuels, LLC, ("e-biofuels") which was owned and/or operated by his co-conspirators, Craig Ducey, Chad Ducey, Chris Ducey, and Brian Carmichael. E-biofuels was a renewable fuel producer that had a biodiesel production plant in Middletown, Indiana. That plant was capable of processing animal fats and vegetable oils ("feedstock") by introducing alcohol and a catalyst in a heated system of tanks and pipes. The process caused chemical reactions within the resulting mixture which, once separated from byproduct and waste, was B100 biodiesel. Although e-biofuels had a facility capable of producing biodiesel from feedstock, the production equipment was hardly used at all between the fall of 2009 and the summer of 2011. During that period, e-biofuels was not in the business of manufacturing biodiesel. Instead, it bought and sold biodiesel that had been manufactured by others, almost all of which the company obtained through Caravan and CIMA. E-biofuels illegally sold the product as its own. Between the fall of 2009 and the summer of 2011, there was essentially no production at the e-biofuels facility: it was used as a transfer station and for office space.

11. Specifically, during that time, e-biofuels purchased biodiesel from Caravan and CIMA, and then sold it to fuel retailers and others. This was very profitable, because FURANDO, Caravan, and CIMA could buy inexpensive biodiesel that had already been used for tax credits and RINs. Having been

used for tax credits and RINs, the fuel was ineligible for any additional tax credits or RINs. This RIN-stripped B99 was much less expensive than B100 with RINs, because of its incentive ineligibility. FURANDO made this RIN-stripped B99 available to e-biofuels. Once e-biofuels took possession, the Indiana co-conspirators sold it to customers as if it was eligible for RINs and tax credits—knowing that it was not—and realized huge profits.

12. FURANDO and Tracy participated in meetings on behalf of CARAVAN and CIMA in which the co-conspirators agreed on how they would execute the scheme described above. Sometime between in or about September 2009 and in or about January 2010, Tracy and FURANDO had one or more telephone conversations with Carmichael, Craig Ducey, and Chad Ducey discussing the scheme. Early on, FURANDO supplied e-biofuels with biodiesel and accurately described that material on Bills of Lading and other documents. Craig Ducey and other co-conspirators realized that this would leave an incriminating paper trail and insisted that FURANDO and Tracy describe what they delivered as "feedstock" to conceal the true nature of the product. FURANDO and Tracy complied with Craig Ducey's demand with respect to Invoices and some Bills of Lading.

13. When FURANDO and Tracy realized how much money e-biofuels was getting by fraudulently recertifying what they supplied, they insisted on getting a larger cut of those profits. This was accomplished by raising the price that the e-biofuels co-conspirators paid for biodiesel.

7

14. Beginning in approximately February 2010, the co-conspirators increased the scale of the fraud scheme. FURANDO and Tracy negotiated very large contracts with a company that could supply them with RIN-stripped B99 at market prices. Craig Ducey and Chad Ducey would approve wire transfers to FURANDO's companies, which they would use to purchase RIN-stripped B99 from their supplier. Upon receiving money by wire from e-biofuels, FURANDO would cause his employees to pre-pay the supplier for a volume of biodiesel, as required under the long-term contracts. The supplier would then release biodiesel from one or more fuel terminals around the country. FURANDO would then cause one of his employees to pass on load numbers to e-biofuels so that truckers could use those numbers to access loads of fuel at a terminal. Sometimes the truckers would deliver the RIN-stripped B99 to the e-biofuels plant, where it was offloaded into storage tanks, for later sale as B100 with RINs. Sometimes, the trucks would stop at the e-biofuels plant for new, false paperwork and subsequently deliver the fuel to the customers without offloading. And, at other times, the truckers would deliver the fuel directly to e-biofuels customers without traveling to the plant at all. The logistics of this transportation was overseen by Chris Ducey. Co-conspirator Brian Carmichael oversaw sales of the product that e-biofuels fraudulently recertified, both while working directly for e-biofuels and then later as a broker operating his own company.

15. Victim customers were told that e-biofuels produced this fuel, when in fact it only purchased the fuel from Caravan and CIMA. With a few

8

exceptions, e-biofuels forwarded their customers false Certificates for Biodiesel in support of the IRS tax credit and then transferred illegally-generated RINs through an electronic database maintained by the EPA. These paper and electronic documents stated that the product was B100 with RINs, when all the co-conspirators knew that it was RIN-stripped B99.

16. E-biofuels employees under Chris Ducey's supervision would routinely: produce false Bills of Lading claiming that product delivered by e-biofuels was B100; generate and assign new, fraudulent RINs to truckloads of biodiesel; and fraudulently produce paperwork that allowed its customers to claim the IRS tax credit. In addition, Chris Ducey oversaw the production of false Caravan Bills of Lading on behalf of the conspiracy. These described "feedstock" deliveries by Caravan that never occurred. Chris Ducey sent a complete set of these Bills of Lading to FURANDO and Tracy to use if EPA or other agencies inquired about e-biofuels.

17. This scheme added more than $55,000,000 in fraudulent value to approximately 35,000,000 gallons of biodiesel. It also cost taxpayers millions of dollars in improperly issued tax credits, which are directly traceable to the co-conspirators' scheme.

18. In the course of the conspiracy, FURANDO recruited others into it, including employees of his company. He would refer to the program of recertifying RIN-stripped B99 as "Alchemy." Furando threatened some of his co-conspirators.

**WIRE FRAUD**

19. The above paragraphs establish that FURANDO and his co-conspirators devised and executed a scheme to defraud e-biofuels customers of the value associated with RINs and blending credits by assigning fraudulent RINs to and producing false paperwork for biodiesel that they knew had already been used to claim those incentives.

20. During the course of the conspiracy, the co-conspirators had to accomplish all of the logistics necessary to legitimately buy and sell biodiesel. In doing so, they routinely transmitted and caused others to transmit information by wire to move biodiesel, to get attendant paperwork to the right party, and to cause the EPA to generate and transfer RINs, as described below:

21. FURANDO insisted on prepayment from e-biofuels for the release of biodiesel from fuel terminals. And FURANDO required careful reconciliations to ensure that Caravan and CIMA were fully paid for any biodiesel delivered. By doing so, FURANDO caused the wire transmissions charged in Counts 13, 16, 18, 20, and 25.

22. In most cases, FURANDO would allow biodiesel to be released only after his companies received payment for it, i.e. he insisted on prepayment. Once his companies were prepaid, he caused his employees, as part of the regular operation of his businesses, to transmit documentation of the payment by email to FURANDO's biodiesel suppliers, as charged in Count 14. That documentation of payment would start the process needed to release fuel.

23. Once FURANDO's employees sent payment confirmation to FURANDO's supplier, the supplier would direct the fuel terminal to release fuel. The supplier would then pass along allocation numbers to FURANDO's employees. As part of the regular operation of the scheme, FURANDO caused the information about those allocations to be transmitted, by email, to e-biofuels, as charged in Count 15.

24. By purchasing very large volumes of biodiesel from his supplier, FURANDO caused the supplier to transmit after-the-fact invoices for prepaid biodiesel, as charged in Count 21.

25. By supplying biodiesel for e-biofuels to use to execute the scheme, and by supplying it at fuel terminals, FURANDO caused trucking companies to move the fuel and to transmit billing paperwork, as charged in Count 17.

26. By supplying biodiesel for e-biofuels to use to execute the scheme, FURANDO caused e-biofuels to invoice its customers for B100 biodiesel with RINs when it was supplying B99 without RINs. Those invoices packets were transmitted by wire, as charged in Count 19.

27. In concert with his co-conspirators, FURANDO caused biodiesel to be supplied in Texas, even though e-biofuels was based in Indiana, making it necessary for e-biofuels employees to transmit false bills of lading packets between those states, as alleged in Counts 22, 23, and 24.

**FALSE STATEMENTS**

28. FURANDO is charged in Count 39 with lying to federal agents during an interview. As described in the preceding paragraphs, FURANDO

11

knew that his Indiana co-conspirators were recertifying biodiesel, which he had supplied, to illegally assign RINs and allow tax credit claims. During the alleged conspiracy, FURANDO was recorded on several occasions explaining to others what he knew his co-conspirators were doing. Thus, during a search warrant executed on May 24, 2012, it was a false statement for FURANDO to tell a federal agent that he was never told by anyone that e-biofuels was putting RINs on RIN-less biodiesel. During the conspiracy, FURANDO knew (and told others he knew) that the e-biofuels plant was not operating. Thus, it was a false statement for FURANDO to tell a federal agent that he thought the e-biofuels plant was running during the entire time he was doing business with e-biofuels. During the conspiracy, FUANDO knew (and told others he knew) that e-biofuels was shipping biodiesel directly to customers from the fuel terminals where title transferred to e-biofuels, without going to the e-biofuels facility in Middletown, Indiana. Thus, it was a false statement for FURANDO to tell a federal agent that he was not aware of that fact.

29. Bank records and other documents show that money flowed from e-biofuels customers to e-biofuels to FURANDO's companies to FURANDO's biodiesel supplier. This money flow was part of the scheme to defraud. Witnesses and documents can show that FURANDO made the purchases alleged in Counts 54 through 65, which were prohibited transactions because they were made with the proceeds of fraud.

30. All actions done by FURANDO and Tracy in furtherance of the criminal conduct were done on behalf of Defendants CARAVAN and CIMA and

for the benefit of these companies. Both companies realized substantial gross profits through this criminal conduct.

31. Finally, the parties stipulate and agree that the Indictment filed in this case truthfully and accurately describes the financial transactions, communications and actions taken by JOSEPH FURANDO, Katrina Tracy, and the officer, employees or agents of Defendants CARAVAN and CIMA.

Respectfully submitted,

4-15-2015
Date

_____ for
JOSH J. MINKLER
UNITED STATES ATTORNEY

4-15-2015
Date

_____
Steven D. DeBrota
Senior Litigation Counsel

4-15-2015
Date

_____
Jake Schmidt
Special Assistant U.S. Attorney

JOHN C. CRUDEN
ASSISTANT ATTORNEY GENERAL
ENVIRONMENT AND NATURAL
RESOURCES DIVISION
U.S. DEPARTMENT OF JUSTICE

15 April 2015
Date

_____
Thomas T. Ballantine
Assistant Section Chief
Environmental and Natural
Resources Division
U.S. Department of Justice

_4/15/15_
Date

JOSEPH FURANDO
Defendant

_4/15/15_
Date

James H. Voyles  #631-49
Attorney for Defendant Joseph Furando

_4/15/15_
Date

Joseph Furando
On behalf of Defendants
CARAVAN TRADING COMPANY, LLC
CIMA GREEN, LLC

_4/15/15_
Date

Christine Furando
On behalf of Defendants
CARAVAN TRADING COMPANY, LLC
and
CIMA GREEN, LLC

_4/15/15_
Date

Robert Garibaldi
Attorney for Defendants
CARAVAN TRADING COMPANY, LLC
and
CIMA GREEN, LLC

14